## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **SAMANTHA CARLIN,** | |
| **PLAINTIFF** | **Civil Action No.: _____** |
| v. | |
| **BOEHRINGER LABORATORIES, LLC,** | **JURY TRIAL DEMANDED** |
| **DEFENDANT.** | |

## COMPLAINT AND JURY DEMAND

Plaintiff Samantha Carlin, by and through her undersigned attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.     This is an action by Samantha Carlin (hereinafter "Ms. Carlin" or "Plaintiff"), a former employee of Boehringer Laboratories, LLC (hereinafter, "Boehringer" or "Defendant"). Ms. Carlin has been harmed by Boehringer's harassment and discrimination on the basis of her sex, and retaliation for Ms. Carlin's complaints of discrimination and harassment, culminating in her wrongful termination on February 17, 2020.

2.     This action arises under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII").

## JURISDICTIONAL STATEMENT

3.     This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.     The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be

commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On May 21, 2020, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). The EEOC issued a Notice of Right to Sue to Plaintiff and this action has been timely filed with respect to Plaintiff's receipt of said Notice pursuant to an agreement amongst the parties.[1]

## **VENUE**

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8. This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with the claims took place in this judicial district.

## **PARTIES**

9. Plaintiff Samantha Carlin is an adult female citizen and resident of West Chester, Pennsylvania and the United States of America.

10. Defendant Boehringer Laboratories, LLC is a Pennsylvania company with its corporate headquarters located at 300 Thoms Drive, Phoenixville, PA 19460.

---

[1] It has been less than one year since Ms. Carlin dual-filed her Charge of Discrimination as a Complaint with the Pennsylvania Human Relations Commission for Defendant's violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). Ms. Carlin will seek to amend her Complaint in this matter to add her PHRA claims once she has exhausted her administrative remedy with respect to those claims.

11. At all relevant times, Defendant is and has been an employer employing more than fifteen (15) employees.

12. Defendant does significant business within the Commonwealth of Pennsylvania.

13. At all relevant times, employees of Boehringer acted as agents and servants for Boehringer.

14. At all relevant times, employees of Boehringer were acting within the scope of their authority and in the course of employment under the direct control of Boehringer.

15. At all times material hereto, Boehringer acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Boehringer and in furtherance of Boehringer's business.

16. At all times relevant hereto, Defendant is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

17. At all relevant times hereto, Plaintiff Samantha Carlin was an "employee" of Defendant Boehringer within the meaning of the laws at issue in this suit and is accordingly entitled to the protections of said laws.

18. This Honorable Court has jurisdiction over Defendant.

## FACTS

19. Boehringer is a medical technology company which seeks to introduce innovations in certain medical fields, with headquarters in Phoenixville, Pennsylvania.

20. In November 2017, Ms. Carlin applied for the posted position of Director of Medical Device Innovation for Defendant.

21. Despite a positive initial phone interview with Kevin Klocek on December 6, 2017, Ms. Carlin was informed that another candidate, Matthew Wampler, had accepted an offer for the position.

22. Due to Ms. Carlin's outstanding credentials and experience, however, Defendant offered Ms. Carlin a similar position, with the title of Director of New Opportunities and Innovation.

23. Ms. Carlin was hired by Boehringer in January 2018 as the Director of New Opportunities and Innovation.

24. While employed at Defendant, Ms. Carlin excelled in her position and performed her duties in an excellent and professional manner.

25. Despite her loyalty and consistent performance, Ms. Carlin was subjected to discrimination and harassment on the basis of her sex, and was wrongfully terminated as a result of such discrimination and in retaliation for complaining about discrimination and harassment.

26. Ms. Carlin began her employment with Defendant on January 8, 2018.

27. As Director of New Opportunities and Innovation, Ms. Carlin was to report to Christopher Radl, Vice President of Research and Development.

28. Throughout the entirety of her employment, Ms. Carlin was a dedicated, loyal and hardworking employee.

29. Ms. Carlin's dedication, hard work and excellent performance was universally acknowledged by management, including, but not limited to, Mr. Radl, and was repeatedly confirmed throughout her employment.

30. Ms. Carlin achieved tremendous success and accomplishments during her employment.

31.    In July 2018, during a quarterly board meeting, Ms. Carlin presented a new product pipeline of infection control products that she thought of and designed.

32.    This was a great honor for Ms. Carlin, as typically only members of senior management made presentations to the Board. In October 2018, Ms. Carlin was told that a Board member had referred to her as a "game changer" in the quarterly Board meeting.

33.    Also in October 2018, after having worked at Defendant for less than one year, Ms. Carlin received a raise in the form of an additional $100 per week, increasing her salary from $130,000 to $135,200 per year.

34.    In fact, Ms. Carlin was told at her 2018 year-end review by Mr. Radl that she received the highest review he had ever given any of his employees.

35.    Notwithstanding the foregoing, Ms. Carlin was subjected to harassment and discrimination by Mr. Radl, her direct supervisor, on the basis of her sex, and was thereafter unlawfully terminated due to such discrimination and in retaliation for her complaints of harassment and discrimination.

36.    Within the first several months of her employment, Ms. Carlin was exposed to aggressive and hostile outbursts from her direct supervisor, Mr. Radl.

37.    In addition, Mr. Radl often treated Ms. Carlin, a female, in a degrading manner.

38.    These events occurred in front of other Boehringer employees, virtually all of whom were male, adding to Ms. Carlin's embarrassment and discomfort.

39.    For example, Ms. Carlin attended a Product Pipeline meeting every week with Mr. Radl, as well as with Mr. Klocek and Mr. Wampler.

40.    During one of these meetings, Mr. Radl became extremely frustrated when Ms. Carlin indicated that she did not understand his logic for a particular device.

41.     Mr. Radl began speaking louder and louder in an increasingly degrading manner.

42.     After the meeting concluded, Mr. Radl pulled Ms. Carlin aside to acknowledge his inappropriate behavior and stated that this is how he was, and not to take offense.

43.     Ms. Carlin soon discovered that these aggressive and outlandish outbursts were much more typical than they were unusual.

44.     The outbursts were so common that Mr. Radl would frequently use the phrase "no friction, no fire" after his outbursts.

45.     In another example of Mr. Radl's degrading and marginalizing behavior towards Ms. Carlin, Ms. Carlin organized and ran a meeting with the Engineering and Marketing teams to discuss device ideas to assist in gall bladder removal.

46.     Ms. Carlin began to request that everyone sketch their ideas on paper but Mr. Radl interjected, demanding that the ideas be presented his way.

47.     When Ms. Carlin disagreed, Mr. Radl became very loud and adamant.

48.     Ms. Carlin was then compelled to sit down and allow Mr. Radl to run the rest of the meeting that she had planned and organized.

49.     Mr. Radl's behavior was such that two members of the Marketing team emailed Ms. Carlin afterwards due to his outrageous conduct.

50.     Ms. Carlin was not the only female subjected to Mr. Radl's discrimination and harassment.

51.     Ms. Carlin also is aware that Mr. Radl had outbursts directed at a female co-op, Priya Gupta, and hijacked a project that she had been managing.

52.     Mr. Radl also refused to let Ms. Gupta attend meetings with physicians to present prototypes that she had made, and instead, had two White males attend in her place.

53.     Mr. Radl also made inappropriate remarks and contact, treating Ms. Carlin differently as a female in a work environment consisting of mostly males.

54.     In September 2018, while conducting a weekly meeting with the Engineering Team, Ms. Carlin informed the group that she would be attending a trade show the following week to promote the line of infection control products.

55.     In front of the entire Engineering Team of all White males, Mr. Radl directed Ms. Carlin to "dress appropriately," noting that a former female employee wore dresses that were too short to a conference and got in trouble with the Board of Directors.

56.     This comment was extremely embarrassing for Ms. Carlin, as she never dressed inappropriately at work.

57.     This created a very awkward and uncomfortable atmosphere for Ms. Carlin, and for the rest of the week, she worked by herself at the lab, instead of at her desk among her coworkers as she typically did.

58.     Immediately before she left for the conference, one of the male engineer employees reminded Ms. Carlin, in front of the entirely male Engineering Team, to pack her mini skirt.

59.     In a particularly inappropriate incident between Ms. Carlin and Mr. Radl, in March 2019, Ms. Carlin discovered and reported to Mr. Radl that the night cleaning staff had been throwing people's food items and storage containers away.

60.     Another employee, Steven Moulden, Production Development Specialist/Technician on the Engineering team, was also present, and noted that the staff had thrown out his containers as well.

61.   Mr. Moulden stated that he had already complained about the food and storage container issue to Patricia Paul, Director of Administration, which Ms. Paul had not resolved.

62.   Mr. Radl assured Ms. Carlin that he would reach out to Ms. Paul, but directed Ms. Carlin to reach out to Ms. Paul as well.

63.   Per Mr. Radl's specific instructions, Ms. Carlin sent an email to Ms. Paul, copying Mr. Radl on the email.

64.   After a week passed by with no response, Ms. Carlin sent a follow up email.

65.   To the extent Mr. Radl and Ms. Paul had engaged in any discussions regarding the issue, Ms. Carlin was not notified and did not receive any communication or update regarding their discussions.

66.   Immediately after she sent the follow up email, Mr. Radl exploded, screaming at Ms. Carlin in front of the entire staff to meet with him right away.

67.   Mr. Radl's outburst was done in an open office area and was loud enough for everyone in the Marketing/Engineering area to hear.

68.   Ms. Carlin followed him into a conference room, where he began shouting at Ms. Carlin with statements such as: "what's wrong with you?" and "I told you to talk to [Ms. Paul], not write an email!"

69.   Despite Ms. Carlin's efforts to explain that he had told her to speak with Ms. Paul, and that she had only sent the follow up email because she had not received a response, Mr. Radl continued to scream at Ms. Carlin.

70.   Ms. Carlin became increasingly upset, to the point that she was on the verge of crying, and stated that she was leaving. Mr. Radl then apologized, stating that he was "f**king it up," and told Ms. Carlin to hug him.

71.  Although uncomfortable, Ms. Carlin permitted Mr. Radl to hug her, after which he stated that he cared about her and that they would "do great things together."

72.  Ms. Carlin was extremely upset and shaken from the entire ordeal and left the office to regain her composure.

73.  She returned to the office approximately 45 minutes later and sat down at her desk.

74.  After she sat down, Mr. Radl came up behind her and, uninvited, began rubbing her shoulders, saying, "thank god you came back."

75.  Mr. Radl requested that they meet in the conference room, where he reiterated his apology, and again asked Ms. Carlin to hug him.

76.  Ms. Carlin was again extremely uncomfortable with the intimate contact, but, as before, permitted Mr. Radl to hug her.

77.  During the awkward physical contact, Defendant's Vice President of Sales, Ed Pearlstein, walked by the conference room and saw Ms. Carlin and Mr. Radl in an embrace.

78.  Mr. Radl became red and pulled away from Ms. Carlin.

79.  At the end of the day, Mr. Radl asked Ms. Carlin to meet for a third time in the conference room.

80.  He again apologized, but, to Ms. Carlin's relief, did not impose another uncomfortable embrace upon her.

81.  The following morning, Ms. Carlin felt too uncomfortable to go to work, due to the events of the previous day.

82.  Ms. Carlin sent Mr. Radl an email stating that she was taking the day off.

83.  Mr. Radl knew that Ms. Carlin had used a PTO day due to her discomfort and upset over what had happened the previous day.

84.    At 8:00 a.m. on the following workday, Ms. Carlin requested to meet with Jackie Hollar, Defendant's Human Resources and Payroll Manager.

85.    Thus, immediately upon Ms. Carlin's return to work the following morning, at 9:00 a.m., she met with Ms. Hollar to complain about Mr. Radl's inappropriate behavior and conduct.

86.    Ms. Hollar was very apologetic for Mr. Radl's behavior and noted that he was very concerned that his most recent inappropriate conduct would be the "straw that broke the camel's back" and would induce Ms. Carlin to quit.

87.    Ms. Hollar also indicated that Mr. Radl wanted to know why Ms. Carlin had taken the day off. Ms. Hollar ended the conversation by requesting that, when Ms. Carlin was ready to quit, to let her know in advance so it did not come as a surprise.

88.    In fact, in recognition of the inappropriate conduct and atmosphere that existed at Boehringer, Ms. Hollar made the comment to Ms. Carlin that, "I might be waving the white flag, too."

89.    The all-male culture was enshrined and further perpetuated by Defendant family members.

90.    After having spoken with some of the newer female employees, Ms. Carlin mentioned to Barbara Boehringer McConnell, a Board member and family member of Defendant owner, that it might be nice to organize a women's group with resources for female employees.

91.    Ms. McConnell responded that any sort of "women's group" would be discriminatory, and that, in the future, Ms. Carlin should bring all ideas first to Mr. Radl to make sure that they were good ideas.

92.  Even the hiring of Ms. Carlin and Mr. Wampler, who were given similar roles at Defendant, demonstrates the preference Defendant had for male employees.

93.  Mr. Wampler only holds a Master's degree, an MBA.

94.  Moreover, Mr. Wampler's sole work experience involved owning a chain of "Jimmy John" restaurants.

95.  Conversely, Ms. Carlin holds her Master's degree in Product Development, which is an interdisciplinary degree between business, mechanical engineering, and industrial design.

96.  Ms. Carlin also holds an MBA from MIT, where she also received an MBA Certificate in Entrepreneurship & Innovation, and another MBA Certificate in Healthcare.

97.  Ms. Carlin started her own healthcare company, which she operated for the four years prior to her employment with Respondent.

98.  In addition, prior to her employment with Respondent, Ms. Carlin had one technical patent and one patent pending.

99.  Notwithstanding this great disparity in education and experience, Mr. Wampler fit the white male culture so clearly desired by Defendant and thus received the same or similar role as Ms. Carlin.

100.  Other female employees also acknowledged the male-dominated and discriminatory workplace.

101.  In August 2019, one of the two female sales agents quit, informing Human Resources that Defendant was a "boy's club" and that there were no opportunities for women.

102.  Two weeks later in September 2019, Nora Ayling, the Pilot Sales Agent assigned to Ms. Carlin's projects, also quit, expressing her discomfort that if she did not flirt with her manager, he treated her poorly and in a hostile manner.

103.   Ms, Ayling had been solely responsible for sales of Ms. Carlin's infection control products, which involved Ms. Carlin's involvement in attendance at such sales meetings, gathering feedback, and preparation of marketing materials for the products.

104.   After Ms. Ayling quit, the sales of all such infection control products were put on hold until Defendant hired a new Pilot Sales Agent.

105.   However, Defendant never filled the position, resulting in a significant lull in Ms. Carlin's work.

106.   Despite her extreme discomfort at the unequal treatment and inappropriate conduct, Ms. Carlin continued to work diligently and perform excellently, and she continued to be praised by various high-ranking employees.

107.   In September 2019, Ben Ground, Vice President of National Accounts, complimented Ms. Carlin on how much she had accomplished at Boehringer in such a short period of time and told her that Defendant really needed her there.

108.   On September 19, 2019, Ms. Carlin helped a college co-op with a final presentation to the Marketing and Engineering Teams.

109.   After the presentation, Mr. Radl told Ms. Carlin that she did product development better than him (Mr. Radl), and asked if she could help the Engineering Team the way that she had helped the college student.

110.   In October 2019, Mohamad Moussa, the Vice President of Manufacturing, complimented Ms. Carlin's work, noting in particular the great job she did with the Cell Sleeve product, and stating that he could see Ms. Carlin as one of Defendant's Department heads.

111.    Mr. Moussa also told Ms. Carlin that he was impressed with how quickly she was able to get the Cell Sleeve product to market and the quantity of work she was able to accomplish in such a short period of time.

112.    Ms. Carlin mentioned to Mr. Moussa that she was interested in having her own product development team.

113.    Mr. Moussa expressed his full support for the idea, and told Ms. Carlin to push for it.

114.    In October 2019, due to her conversation with Mr. Moussa, and the fact that Mr. Radl had specifically asked Ms. Carlin to replicate her product development work for the Engineering Team after her work with the college co-op, Ms. Carlin informed Mr. Radl of her significant interest in having her own product development team.

115.    Mr. Radl told Ms. Carlin that he would organize a meeting with the President.

116.    Thereafter, on October 28, 2019, Ms. Carlin gave a presentation to John Karpowicz, the President of Defendant, on what a product development department would look like and how it would integrate with Defendant.

117.    On November 1, 2019, Mr. Karpowicz called Ms. Carlin into his office to inform her that Defendant would not be moving forward with her proposed department at that time, and that all product development efforts would remain under Mr. Radl.

118.    Ms. Carlin was out of work for approximately eleven (11) days in the month of November, consisting of nine (9) days for her wedding and two (2) two paid vacation days for the Thanksgiving holiday.

119.    Despite her absence for this period, Ms. Carlin continued to perform excellently.

120.    On November 20, 2019, Ms. Carlin gave a presentation to all the Department heads regarding a website she was implementing for the infection control products.

121.   This was designed to help with the sales of her products, since Defendant refused to hire a replacement Pilot Sales Agent.

122.   After the meeting, Mr. Radl stated that she had done a good job.

123.   Notwithstanding the foregoing, on December 3, 2019, during a typical weekly morning progress meeting with Mr. Radl, Mr. Radl abruptly stated that Ms. Carlin was "underperforming" in her role for the past couple of weeks.

124.   Mr. Radl stated that he had only noticed because he "knew" Ms. Carlin and she seemed withdrawn. Ms. Carlin was extremely upset and surprised to be told this, reminding Mr. Radl that her projects were on hold, her request for more work had been denied, and her work on the website had been taking a significant amount of time.

125.   Mr. Radl then insinuated to Ms. Carlin that she needed the Bible, but told her that he did not have a Bible to give to her.

126.   Mr. Radl then stated that he was "still willing to work with" Ms. Carlin and that they would regroup later.

127.   Ms. Carlin later approached Ms. Hollar in Human Resources to express her frustration at being unexpectedly accused of underperforming, without any actual explanation.

128.   Among other things, Ms. Carlin indicated to Ms. Hollar that she had worked hard to meet Mr. Radl's expectations, but that he would change his expectations with respect to Ms. Carlin and put forth obstacles in her way.

129.   Ms. Hollar scheduled a follow-up meeting with Ms. Carlin to take place in two days.

130.   Two days later, on December 5, 2019, Ms. Carlin met with Ms. Hollar.

131.   Among other things, at this meeting, Ms. Carlin reiterated her belief that she was being targeted and that Mr. Radl was placing obstacles in her path so that she would leave Defendant.

132.   Ms. Carlin noted that her projects had been put on hold, she wasn't given the opportunity to create a product development department, and then was suddenly told she was underperforming, despite her list of accomplishments and substantial positive feedback from others at Defendant.

133.   Ms. Carlin also reported to Ms. Hollar an instance of sexual harassment of which she had heard regarding another female employee, Meaghan Clancy, which had gone unaddressed by Defendant.

134.   Ms. Hollar apologized for what Ms. Carlin was experiencing, agreeing that being told that she was underperforming, without any explanation, was not proper and that she would be speaking with Mr. Radl.

135.   Ms. Hollar suggested that she, Ms. Carlin and Mr. Radl meet the following week to discuss next steps.

136.   The following week, Ms. Carlin met with Ms. Hollar and Mr. Radl to discuss her alleged performance issues.

137.   Mr. Radl now claimed to have a list of grievances with Ms. Carlin that had been ongoing for the past two months, rather than the previously stated two weeks.

138.   Ms. Carlin tried to explain that, between her wedding and the Thanksgiving holiday, she had been out of the office for half of November, but Ms. Hollar dismissed her comments and told her not to focus on the past.

139.  Also in contrast to his prior statement that only he could tell because he "knew her," Mr. Radl now stated that Ms. Carlin needed to be more engaged in front of the younger members of the team, as they were "sponges" that "absorbed everything."

140.  Ms. Carlin reiterated several of her concerns regarding Mr. Radl and his treatment towards her, including that his comments during a recent presentation she had made completely undermined her presentation.

141.  Ms. Hollar noted that Ms. Carlin had demonstrated "phenomenal efforts" during her employment and had several products come about as a result of her efforts.

142.  Notwithstanding such acknowledgement, at the end of the meeting, Ms. Hollar referred to Ms. Carlin as "Eeyore-ish" for the past couple of months, but noted that she had "more of a pep in her step" the last few days.

143.  These comments were extremely surprising to Ms. Carlin, as she rarely ever saw Ms. Hollar, other than to seek her out for Human Resources issues, and Ms. Hollar had no reference or basis for her comments.

144.  Mr. Radl then asked what "Eeyore-ish" meant, and Ms. Hollar proceeded to act out the gloomy and depressed Disney character as an imitation of how Ms. Carlin allegedly appeared in the office.

145.  Ms. Hollar then asked Ms. Carlin about the nature of her talks with Ms. Gupta, the college co-op who had recently been hired full-time, implying that Ms. Carlin had indicated that Ms. Gupta had only been hired because was she was a minority.

146.  Ms. Carlin denied having ever made such a comment and requested to know who made that statement.

147.  Ms. Hollar refused to indicate the source, stating that it was not important.

148.   Ms. Hollar later admitted that she herself came to that conclusion based on Ms. Carlin's body language and how she presented herself when she referred to Ms. Gupta.

149.   Ms. Hollar also became defensive, claiming that Defendant met the averages for minority representations in specific fields, even though the issue had never been brought up in any way during their meeting.

150.   Ms. Carlin was extremely upset from the meeting and returned to her desk in tears.

151.   She emailed Mr. Radl to indicate that she would be finishing her work from home that day so that the team would not witness her obvious upset.

152.   In spite of the unfair and unwarranted accusations made against her, Ms. Carlin thereafter sought to demonstrate her hard work ethic and commitment to Defendant.

153.   In December 2019, Ms. Carlin worked tirelessly, submitting ten (10) market assessments, which was more than she had ever produced in a quarter.

154.   In late December 2019 to early January 2020, Ms. Carlin was requested, and agreed, to give interviews to two Engineering Director candidates.

155.   After discussions, it was determined that Ms. Carlin would interview each of the candidates together with her colleague, Michael Ashleigh.

156.   On January 6, 2020, Ms. Carlin had her end of the year performance review, which was supposed to be a six-month review for the second half of 2019.

157.   However, her review was almost entirely focused on her performance for her alleged "underperformance" of 2 weeks (which was later changed to 2 months).

158.   It was below Defendant average and was the lowest review she had ever received at Defendant.

159. This negatively affected her bonus, as her mid-year review score would have earned her $7,000 more in her bonus.

160. Ms. Carlin objected to the use of her alleged "underperformance" for that limited time period as justification for her poor performance review, reminding Mr. Radl that she had gotten married and had missed half of November.

161. Mr. Radl responded that her wedding did not matter.

162. Because she was severely disturbed by what had transpired at her review, Ms. Carlin went directly to Ms. Hollar, stating that she could not, in good, faith, interview two candidates based on her review and the treatment and comments she had received.

163. Ms. Hollar initially decided that Ms. Carlin should meet again with her and Mr. Radl, but then immediately told her that Ms. Carlin was "checked out" and "done" and that such a meeting probably would not help.

164. Ms. Carlin agreed that it probably would not, as she was extremely upset that she just had a 6-month review that focused only on two weeks, and was told that her wedding did not matter.

165. Extremely upset and in the moment, Ms. Carlin said that she hated it, would be speaking with counsel regarding her review, and left.

166. The interviews were held later that week without Ms. Carlin.

167. Four days later, on January 10, 2020, Ms. Carlin received an email from Ms. Hollar.

168. The email entirely mischaracterized their conversation from January 6, claiming that, in response to Ms. Hollar's suggestion that Ms. Carlin meet with her and Mr. Radl, Ms. Carlin refused and stated that she hated Defendant.

169.   Ms. Hollar further stated in the email that Ms. Carlin's actions were completely unacceptable and unprofessional, but that Defendant still saw a value in Ms. Carlin's skillset and was willing to work with her.

170.   The email instructed Ms. Carlin to respond by February 13, 2020 to confirm her commitment for mandatory meetings with Ms. Hollar and Mr. Radl.

171.   Immediately after reading the email, Ms. Carlin went to Ms. Hollar's office to make clear that she would agree to meet with Ms. Hollar and Mr. Radl, and had indicated as much previously.

172.   She reminded Ms. Hollar that Ms. Hollar was the one that suggested that the meeting would not do anything.

173.   Ms. Hollar responded that she had only suggested the meeting would not do anything based on Ms. Carlin's body language.

174.   Ms. Carlin then returned to her office and formally responded to Ms. Hollar's email, reiterating that she would meet with Ms. Hollar and Mr. Radl.

175.   In the email, Ms. Carlin also corrected Ms. Hollar's incorrect account of the situation, specifically noting that she had not made such a response when asked if she would meet, and that Ms. Hollar herself had stated that the meeting would not help.

176.   Ms. Hollar did not respond to the email and did not schedule any meeting between her, Ms. Carlin and Mr. Radl.

177.   It was thus clear to Ms. Carlin that, despite her numerous complaints of harassment and discrimination to Ms. Hollar, Defendant sided with Mr. Radl and would not address any of her concerns in any way.

178.   Ms. Carlin continued to work diligently and perform excellent work, as she always had.

179. On January 28, 2020, Ms. Carlin emailed Ms. Hollar requesting information about short-term disability as it related to maternity leave.

180. Ms. Hollar responded that she would gather the materials. She sent the information to Ms. Carlin the following day, on January 29, 2020.

181. On February 17, 2020, on the heels of requesting information relating to maternity leave and complaining to Human Resources regarding the unfair treatment she had received, upon Ms. Carlin's arrival at work, Mr. Radl asked her to meet him in the conference room.

182. Ms. Carlin was then terminated.

183. As the alleged basis of her termination, Ms. Hollar stated that Defendant had tried to make the Director of Innovation position work, but that they could not make it work.

184. Ms. Carlin was told to collect her belongings.

185. The reasons given for Ms. Carlin's termination are pretext for discrimination and retaliation.

186. The reasons given for Ms. Carlin's termination are suspect, as Ms. Carlin had consistently been recognized and commended as an excellent, high-performing and dedicated employee throughout her employment with Boehringer.

187. However, despite her excellent work and significant value to Defendant, Boehringer engaged in a pervasive and severe pattern of discrimination and harassment against Ms. Carlin on the basis of her sex.

188. Tellingly, a number of other women had similar grievances as Ms. Carlin and had been compelled to separate from Defendant, including, but not limited to, Rose Huang, Donna Chin Baar, Nora Ayling and Erin Masters.

189.   Moreover, after Ms. Carlin began complaining about discrimination and harassment, Boehringer created and instituted a plan to attempt to justify her termination.

190.   Based on the foregoing, the reasons given for Ms. Carlin's termination are suspicious under the circumstances.

191.   These suspicious circumstances suggest that Ms. Carlin's termination was motivated by discrimination and retaliation for complaining about harassment and discrimination.

192.   Ms. Carlin was discriminated against and harassed on the basis of her sex, and was retaliated against for her complaints about discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

193.   Ms. Carlin has suffered, and continues to suffer, mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendant.

194.   Defendant and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Ms. Carlin severe emotional distress.

195.   Ms. Carlin has suffered financial losses including, among other things, lost wages, and other compensation, and an obligation for attorneys' fees and costs of bringing suit as a direct and proximate result of the actions and inactions of Defendant.

**COUNT I**
**Sex Discrimination, Harassment and Retaliation**
**Title VII of 1964, 42 U.S.C. § 2000(e), et seq.**

196.   Plaintiff Samantha Carlin repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

197.    Based on the foregoing, Defendant engaged in unlawful employment practices in

        violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act

        of 1991, 42 U.S.C. § 2000(e) et seq.

198.    In discriminating against and harassing Ms. Carlin because of her sex, and retaliating

        against Ms. Carlin for her complaints about harassment and discrimination, Defendant

        violated Title VII.

199.    Defendant's violations were intentional and willful.

200.    Defendant's violations warrant the imposition of punitive damages.

201.    As a direct result of the unlawful employment practices engaged in by Defendant,

        Plaintiff Samantha Carlin has sustained a loss of earnings, severe emotional and

        psychological distress, loss of self-esteem, loss of future earning power, as well as back

        pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

## PRAYER FOR RELIEF

202.    Plaintiff Samantha Carlin repeats and incorporates by reference the allegations of all

        previous paragraphs as if fully set forth at length herein.

        **WHEREFORE**, Plaintiff Samantha Carlin respectfully requests that this Court enter

judgment in her favor and against Defendant, and Order:

   a.   Appropriate equitable relief;

   b.   Defendant to compensate Plaintiff with a rate of pay and other benefits and

        emoluments of employment to which she would have been entitled had she not

        been subjected to unlawful discrimination, harassment and retaliation;

   c.   Defendant to compensate Plaintiff with the wages and other benefits and

        emoluments of employment lost due to Defendant's unlawful conduct;

d.   Defendant to pay Plaintiff punitive damages;

e.   Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

f.   Defendant to pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's attorneys' fees;

g.   Plaintiff be granted any and all other remedies available; and

h.   Such other and further relief as is deemed just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands trial by jury as to all issues so triable.


*/s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Jennifer C. Bell, Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA  19103

*Attorneys for Plaintiff Samantha Carlin*

Dated:  March 1, 2021